W. Steel & Nucor. I'm going to talk about JSW not knowingly joining the conspiracy. The plaintiff's theory is that because we received two ultimatums at separate times in separate settings, based on complaints that each customer had had 12 years apart with M.M.'s principles, that we're supposed to divine that they have somehow entered into an illegal conspiracy to put M.M. out of business. And any response we make to that proves that we have knowingly joined that conspiracy. And that is just not the law. This court's viazes case is dispositive of all the arguments I'm aware of that they've made in this case. And viazes, if a defendant responds to a threat, the viazes sort of adopted Monsanto that that could be considered evidence of collusive behavior as opposed to independent judgment. Viazes actually says, Your Honor, at page 762, if the conduct is as consistent with lawful behavior, the inference cannot be drawn. But then the jury was instructed on exactly the law that you just said isn't the law. The jury was told that if you receive a complaint as a manufacturer or supplier and then independently you decide to, you know, respond to that complaint by refusing to deal, you're not going to be . . . there's no action there. So the district court instructed this jury on exactly the law you're asking that they be told. Yeah. I'm not complaining about the jury instructions. I'm complaining about the sufficiency of the evidence to support the jury's answer under this court's viazes case. Viazes was summary judgment. Right. Okay. But, I mean, your clients, the president of your client, Fitch, was cross-examined aggressively. Is that correct? Is his name . . . I wouldn't say aggressively. Well, is his name Fitch? His name's Fitch. Okay. So when I went back and read that cross-examination, what it looked like he acknowledged was that originally they had a deal, they were going to sell steel, they even extended credit, and then they received two threats chronologically, which were pretty raw ultimatums. But then he gave his reasons that the jury deemed pretextual for why, well, no, we decided to refuse for legitimate reasons as opposed to joining a horizontal conspiracy among the competitors. But each one, the deposition was used against him to say, well, you never consulted an attorney. You didn't give the 60-day notice. Every single argument was presented right to the jury. The arguments were presented to the jury, and Viazes, American Quarter Horse, Monsanto, all those cases say there's a certain area in antitrust law where the jury is not allowed to go because you leave breathing room for legitimate conduct, you don't hold the threat of trouble damages over conduct that's ambiguous and could be legitimate or could be harmful. The jury does not get to look to say this is a pretext. And I know they've attacked Fitch in the brief, but when you see what they said at trial, it doesn't match that. They actually complimented his credibility at the end of their rebuttal argument to the jury, and the things they call impeachment in the brief, at trial they told the judge they're refreshing his recollection, and when they did, he quickly agreed with it. And it was always over minor matters. Well, that's characterization. I think at one point they listed that he's never pulled back from an agreement to sell ever before. And Viazes, in a footnote, says that that makes no difference, and logically it should not because we had never had a customer mislead us into a transaction that impaired our existing customer relationships before. One of our independent reasons is that they came to us in April while still working at Chappell and said we're going to leave Chappell, we want to have some steel ready when we announce. Chappell is a customer of ours, so we say to them, is this okay with Chappell, is this going to cause a problem? They assure us, no problem, we're leaving on good terms, they've never denied that, this isn't Fitch making it up, they've admitted they said that to him. And then as it turns out, Chappell sues them for violating non-competes, gets an injunction, turns into an agreed injunction, and impairs our relationship with Chappell. And there are emails all over the place between American Alloy and Chappell about how they don't trust JSW because we're helping MM. If there's a scheme going on, we're a pawn in that scheme that they're manipulating, but without our actual knowledge that this scheme is going on. This is not a should-have-known test, it's actual knowledge. The law doesn't give you much comfort if you're a pawn, the law in this context, and scholars and courts have all said it, that even if you're a victim and not a sinner, if you're given an ultimatum to freeze out or apply a chokehold, your product's the essential one for M&M to continue to survive. And you accede to that, you agree to it, even if it's a predicament that it's a very awkward one for your client to be in, he made the wrong decision. No, I totally disagree, Your Honor. We have to have knowledge. Of course you have to have knowledge, but if you have knowledge, you're given a threat and you're said, we need to chokehold these people out, and you say, okay, we'll do it. We agreed to sell them steel, now we're going to decide not to sell them steel. At that point, just because you received a call that says you won't get our business anymore, you can't say, well, we're a victim. If we have knowledge. My point is we don't have knowledge, and the inferences they're trying to draw to get to knowledge won't get there. We also have problems dealing with M&M. This is totally independent of any complaints by Alloy or Chappell. Our first shipment, they send us an email, Defendant's Exhibit 216, saying stop shipment until further notice. No explanation, nothing. Now that's concern. We've shipped 75%. We've got 25% still being manufactured, but the bigger concern is they're already $200,000 over the letter of credit that secured payment, so we're exposed already for $200,000. A week later, they meet with us, say we've got this injunction, which was bad news for us, and then say we may have to return steel. We're not Walmart. This is custom made. We can't put it back on a shelf. We don't even have much storage space. We make it, we ship it out, that's how we get paid. We're having bad dealings with them. Their theory is that once we have a dealer complaint, our hands are tied and we're locked into them no matter what. This court rejected that. The district court instructed that that couldn't be the basis for a verdict. That's true, Your Honor, but this court, the Supreme Court, have consistently handled JMOLs and summary judgments in this context. There is an area the jury is just not allowed to go. Business electronics, you said if the complaint originates with a dealer, it doesn't mean the manufacturer can't have independent reasons. Here it didn't even originate with a dealer. We're having trouble with these guys before the dealers ever came to us with complaints. That just added on to it. This termination thing is the biggest red herring in the world. The 60 day written notice is an alternative form of termination, says that in the contract. Mr. Fitch says I didn't put it in writing because I'm talking to him face to face, but if he had said here's 60 days notice, what would have happened? Their letter of credit would stay active, tied up for 60 days. Instead, we gave it back to them. They accepted it. They didn't say this is a breach. You know, they're disappointed, but they're glad to have it. They used it to buy more steel. They stayed in business another 20 months. They bought our steel from other distributors, and we didn't care about that. We just didn't trust them for our own contractual relationship. And then they say, well, suddenly we had to look for another supplier. Under this contract, that was the case every time they placed an order. Paragraph one, right before the sentence of paragraph two says, unless you agree on price, there's no deal. Any time we quoted them a price, if they didn't want it, they were going to have to go to another supplier. Thank you. All right, Ms. Blatt. Thank you, and may it please the court. Lisa Blatt on behalf of Nucor. Nucor is entitled to judgment outright for two reasons. First, the evidence does not satisfy the heightened standard for antitrust conspiracies. And second, the per se rule should not have applied to Nucor. And if the court rejects these arguments, Nucor is still entitled to a new trial. Most notably, the trial court excluded Nucor's expert, Dr. Jacobs. And there was an egregious error in the damage model that MM does not even contest. As to the first issue, on no evidence excluding the possibility that Nucor acted independently, or showed that Nucor knowingly joined any horizontal agreement. And I want to distinguish between the two. MM's theory of liability is, and the only reason they were tagged with that Nucor not only entered into a vertical agreement with Chapel. But Nucor knowingly joined a horizontal conspiracy between the two dealers. There's not a single shred of evidence under any standard, antitrust or otherwise, that shows that Nucor knew about, much less joined that horizontal conspiracy. What about the conversation with North Shore to try to have them stop dealing with MM? Right, even just putting aside the admissibility of that evidence, and that it would be ambiguous as to whether that was in Nucor's independent interest. That has nothing to do with American Alloy. We could have put a gun in their face and said, MM, you're not allowed to do business. But that doesn't show knowledge of American Alloy. Nucor never spoke with American Alloy. American Alloy never spoke with Nucor. Nucor had no knowledge that Chapel had ever spoken to American Alloy. And the critical difference about Nucor, unlike all the other defendants, is that the decision was made on day one, as of September 1st, not to deal with MM. That's undisputed. That your client never had any relationship, never sold steel. And then to the extent your client did receive threats, the behavior remained constant, didn't sell, is that correct? Right, and let me just cite you, I mean, Twombly. When conduct would occur naturally, even absent illegal conduct, that's insufficient to infer illegal behavior, even under a pleading standard, much less a trial standard. Nucor's position has always been the same towards MM throughout the time period. And the horizontal conspiracy started allegedly on September 8th. What happens if the chronology is you have pre-joinder behavior that's parallel, independent, interdependent, but not collusive. But then you get the North Shore events and Cooper's testimony, admissible, that's just for now assumed, and the Sergevic email, which doesn't directly relate to you, but again, let's assume it's admissible. One interpretation could be that at that point your client realized that it was both in their independent judgment interest, but also they needed to cooperate with Chappell. Right, so- Could it, at that point? No, I mean, this is what's so great about our argument, is that most are saying we entered a presumptively lawful vertical agreement. Nowhere in North Shore does it have anything to do with American Alloy. American Alloy is some dealer. It's all of our behavior is- Your behavior is Chappell, it's a pure vertical, and therefore the error's a legal one, that rule of reason wasn't applied? Exactly, and they're hosed, because they don't get to go back and prove a rule of reason. Here's their only evidence on American Alloy. On the Cooper, North Shore- Sorry, just staying with you legally. Sure. So then Ligon and the Apple decision, none of that's relevant, because a pure vertical arrangement was unadjusted. We're not even talking about a group boycott. Right, you're just on evidentiary sufficiency alone. You don't get to the region. What's your gut best case on applying that dicta sentence about a facilitator? You mean on the Apple, the orchestration? The Second Circuit's statement that the Supreme Court didn't mean to overturn group boycott in a vertical case, just by sort of inadvertent one sentence. Do you agree with the Second Circuit majority on that? I agree with the Second Circuit majority in that they put aside for another day what would happen if Apple was not the orchestrator and was active. But not only we didn't orchestrate, Apple has, Apple, and this has to do with the Legion argument, which we don't need. But when you run a lot less risk of false positives in trying to not show pro-competitive conduct when you let it. Here, there's no shred of evidence, either American Alloy or Nucor, that ties the two. There's just no, we have, even if it's for a criminal case, there's no evidence that we joined a dealer boycott. And we have two extremely good cases on this on page 32 of our brief. That even if you get threats from multiple dealers, that's both vertical, that doesn't show evidence that the two vertical dealers colluded. The search of the email begins to suggest, does it even suggest? No. Whiteman? It just suggests, let's assume it's admitted, it just suggests that Chappell threatened Nucor. So what? That has nothing to do with American Alloy. And again, it's not just Twombly, because there's nothing about the behavior that changed. But the, the best evidence, and, and let me just start with the two pieces. The only way they can show- Your argument then, factually is similar to JSW's, but legally it's, it's very dissimilar. It's very dissimilar, it's very dissimilar because of the timing and Twombly. And there's no evidence linking us to American Alloy. Now, what they tried to do in closing is because it was unequivocal that Nucor had decided on day one. So it seemed kind of odd, nothing changed since September 8th. And that's where counsel starts inventing conversations on October 5th, because he's trying to pretend that somehow Nucor needed assurances of other mills so that maybe Nucor would continue, but it's just a made up conversation. There is no evidence- What percent of Nucor's steel sales is, does the record reflect the Chappell? Does Chappell? Yeah, I don't know. Yeah, it's in there, and I don't know if it was, I know it had a three in it, so I don't know if the three was the first number or the second number. But it's- Go on with your argument. It was a ten year long term relationship. But I want to get to the Cooper testimony, because even assuming it's admissible what Cooper told Shultz and Hume as to what Whiteman told Cooper, Whiteman's shown knowledge or joined their, at most what Whiteman purportedly said is, there's a lot of pressure on the mills from their biggest customers. That's their best statement. Okay, even, even- Because your behavior doesn't change. Not only our behavior doesn't change, even if we had gotten threats from American Alloy, it doesn't show that we knew that Chappell and American Alloy had to meet. In other words, if you, if you just have not- You might have a rule of reason case, because at most you'd have a vertical, but that wasn't- Absolutely, that's their problem, is they didn't want to bring a rule of reason case because they couldn't show effect on competition. Keep in mind, there was a proven, which we're not contesting, a horizontal agreement, and per se liability is improperly imposed. And MM Steel recovered against both the people found liable for the horizontal agreement. So this is an issue of do you tag the vertical person with 160 million in trouble damages. Just following that logic, per se liability applies even the general motors, business electronics, the conclusion that if, if, if a manufacturer, a vertical supplier, chooses to join knowingly what's a pre-existing horizontal per se rule of liability. I mean, you switch facts on me. I know, but I- No, but let me, here's why. You're going to create a split with the third circuit. Well, we're going to create a split either way, because the second- Unless you distinguish Apple. I agree. If you think Apple is an orchestration case, you can put it to a side. But if you vote against us on Legion, you have a direct split, because that's just- Why isn't Apple wrong as an origination case? Because Apple's the opposite, right? If Posner's right that origination controls, here the originators were the horizontal competitors. Right, I mean, there's a dissent in Apple. I know. So even assuming that Apple's correct, ToledoMath is on point. It is directly on point. Berkeley doesn't discuss it. Excuse me? There's no analysis in Toledo. It just applies that sentence. It's still a holding. It's even worse. It's worse than a holding, because there is direct evidence of the manufacturer's bad behavior. And the underlining horizontal conspiracy was what a price fixing, which is a no-no in antitrust law. Group boycotts, they may or may not be subject to per se liability. All right, you've saved some rebuttal time. Mr. Simpson. It pleases the court. Group boycotts are per se liability of taxes to group boycotts. This court recognized this even after Legion in the North Texas specialty. I don't think there's any question that there is a group boycott, a horizontal conspiracy between the two service centers. That's established in the unchallenged answers of the jury to questions. I think the last little conversation we're having at the end does suggest that the Third Circuit would come out differently as to any supplier. This is the most narrowly defined group boycott you can have. And it can fit in with Toledo Mac and it can fit in with everything because it is a targeted denial of access to resources needed for effective competition. Its source is a purely horizontal agreement with no participation vertically from anyone else. People have the power to compel denial of access who are direct competitors of the plaintiff. And it happens in a commodity market where there's no inter-brand competition. But let me address this thing about the pre-decision that it was decided on day one. Because if you look at Randy Charles's testimony, the one who decided. Thinking about Nucor or JSW right now? Thinking about Nucor. And I remember these names and sometimes I don't attach them to the companies. Randy Charles with Nucor who made the decision on whether to sell or not, page 19083 of the record, he says, and he's referring to plaintiff's exhibit 160 that says we're not going to quote MM right now. Says, when you say right now, what does right now mean? Well, today, tomorrow, I had no specific time in mind. It's just right now. I had to consider the situation, how it would impact our existing business. And I needed to call a timeout and say we're not going to quote this business for the time being or any business might be inquired. And this idea that they had a decision from day one, of course, is totally inconsistent with their incumbency policy. Jeff Whiteman said, oh, yes, we would sell to them if they had new business and somehow he could always divine whether they were coming with new business or old business. So it's totally inconsistent with their idea that the only reason we didn't sell to MM is because of the incumbency policy. So that is a wrong view of the record and a wrong statement of the record. This is a per se case. You have the source of the conduct being the horizontal agreement. There's a long pedigree of looking to the source. This court. What's your best piece of evidence that Newcorp knew there was horizontal agreement? Jeff Whiteman's conversation with Byron Cooper. Jeff Whiteman of Newcorp had a conversation with Byron Cooper and he laid out what the conspiracy was and he named names. He described what the conspiracy was and he listed not only JSW, obviously he was talking about his own company, and he listed American Alloy and he listed Reliance. And he said the mills, plural, are getting pressure from their biggest customers, plural. And he named those customers and the customers included American Alloy and it included Reliance. So that is virtually a description of... If we affirm saying the evidence tended to exclude the possibility of independent judgment, any manufacturer that ever gets told that would face exposure. They would never be able to continue in their pre-existing business posture. But here we have two things on each of the appellates. First of all, we have conduct that is not... And I'm going to use Judge Smith's formulation from the Ott Voss's case, whether it's consistent, just equally consistent with independent self-interest. Well, you may arguably have a lot more as to JSW if they've originally extended credit and originally have an agreement to sell, and then chronologically when threats come in, you better not sell, you don't get our business, they stop. But Nucor doesn't have that fact pattern. Nucor didn't make the decision that they say they made at the beginning. We have testimony the jury could credit that they didn't make a decision. Say that again, Nucor didn't make the decision they say they made? What do you mean by that? When the argument is made that they decided from day one before the conspiracy not to sell to MM, that is not true because of the testimony I just read from Randy Charles who made the decision. He was calling a timeout. He hadn't decided, and the incumbency policy, which they touted out as their main defense, was inconsistent with the decision by day one because they said the reason we're not selling is because you're selling to old business. Trouble is, I mean, I'm not, I should speak just for myself, not equipped as an economist to assess that, but I could see a supplier, this is the whole reason that it would have seemed advisable as in the Apple case to ask for rule of reason, at least as to them, because it could be that Nucor just says my distributor is Chappell, and if I don't want other distributors that are gonna have end users being the same one I'm already reaching through Chappell, so it just gets complicated, and you don't get to infer the shortcut of a per se rule, right? Isn't that the logic? We need to look into intentionality here for a vertical supplier. Well, they are somebody who joined with knowledge that American Alloy was participating, joined in a horizontal conspiracy, and you have conduct that is not consistent. That's the Cooper dialogue. That's correct, and that's conduct that's not consistent with independent self-interest. What did they do to North Shore? They pressured North Shore. There's a denial of pressuring North Shore. That's a denial that they made, and the jury could find that that was absolutely false because if you look at plaintiff's exhibit 570 and 587, that's just what they were doing. They were checking to see, well, are Mike and Matt being hired by North Shore? Is North Shore financially supporting them? They told them, don't do business with them. That's confirmed, and that's not in their self-interest in any way, an independent self-interest. Then you have the false denial by Jeff Whiteman, and then the, actually, the denial, the conduct that says we, or the argument that we decided from day one, which is contradicted by Randy Charles's own testimony, which I read, which is also contradicted by the incumbency policy, and the incumbency policy was so full of holes factually, they never mentioned the incumbency policy, the MM. It was never in any of the emails that talked about what they were doing with MM. The jury could conclude that that was a false explanation of what they were doing, and the jury could consider that. The secondary issue of why, how can you keep Jacobs out if you're gonna begin to attack the consistency and adherence of the incumbency policy, and then you're asking the judge to keep that out? That was their only defense to a per se rule. We never attacked the inconsistency of the policy itself. In fact, the argument to keep Mr. Maloney, our expert, from testifying about it was that it's irrelevant whether it's a good policy or a bad policy. The issue is whether they were following it on it, and the jury could determine that. Mr. Maloney didn't testify about whether it was a wise policy or not, and that's all that Mr. Jacobs could testify to, and that was irrelevant. And what Jacobs could try to testify to, or what he tried to testify to, is an economic justification, which doesn't exist in a per se liability case, and he could not bolster witnesses by saying in a Chicago West sort of way, because it's a rational thing to do and a good thing to do, people must be doing it. The jury could- What was the evidentiary objection that was made to the Charles recollection of Cooper's recollection of, wasn't it just a hearsay objection? I'm sorry, did you say the Whiteman- When you're relying on the Cooper testimony so heavily, that's a separate issue before us. Well, there was no objection at trial. There was no objection at trial? No. The ruling that Judge Hoyt made pre-trial on the motion in limine, and you can look at pages 32, 15 through 16 on his motion in limine order, only dealt with the recording and whether the recording could come in. And in the testimony of Mr. Cooper, there was no objection made because the recording was not used. And his testimony was offered as refreshed recollection or past recollection report? What, well, one thing is that Mr. Cooper testified that this was his honest recollection of what Jeff Whiteman had told him. So that takes it out of the hearsay rule altogether, and that's at page 16004 of the record. But even if- Whiteman's relating what somebody else told him, right? No, it's what Whiteman told Cooper. This is my honest recollection. This is my honest recollection of what Jeff Whiteman said, who's an agent of Nucor. And that's not hearsay when someone is saying, this is my honest recollection of what an agent of Nucor said. But there was no objection made to that at the time. And I suggest that it was a strategic reason not to make an objection, because if they started objecting, the recording might come in. And so they made a choice at that time that it was better to cross-examine Cooper than it was to make objections that might lead to the playing of the recording, which had just been verified by the police officer who did the forensics on it. And so they made no objection. So it is admissible. And it describes the group boycott that was alleged in this case and implicates everybody. It mentions American Alloy. It mentions Reliance. It says Nucor's joining in. It says JSW's joining in. About half your time's up. It's a complicated case. Yes, it is. What about turning to JSW's arguments? In JSW's arguments, there is action that is not equally consistent with independent self-interest. And certainly that includes the decision to walk away from the contract, which can incur potential liability, and in fact did result in a finding of a breach of contract in this case. So that meets that particular requirement, if that is a requirement. There are also false denials. What Mr. Fitch said is, I didn't do business with him because of unethical conduct. Then he had to admit that I don't have enough information for the lawsuit on the non-compete issue to be a factor. And then he said, I didn't want to listen to anything that Mike and Matt had to say, and if they said anything to me, I wouldn't have believed it at this juncture. And the jury was entitled to determine that at this juncture means after I formed an agreement. In addition to the things that count against Nucor, and also keep in mind that the Whiten statement implicates JSW just as much as it does Nucor, but there's also three meetings that JSW attended. The first meeting was with MM, where they said, you're putting us out of business. And instead of saying, well, you know, there's other suppliers who can supply you, he said he understood the gravity of the situation. So that shows he knows that nobody else is supplying. And if he knew what was going on and all the others were doing, he could have said the same thing that Byron Cooper said, this is what's happening to you, but he didn't say that. The other thing is the two meetings with Reliance at dinner, and the meeting with American Alloway's president. Those were close in time. They were unprecedented threats that he had never received before. And they weren't about what's happening in the market. Somebody's doing prices or changing prices or engaging in conduct. They're about internal affairs of each company and separated in time suggest even more that they were comparing notes and helping each other and working together and making the same kind of threats. So that's the additional evidence that exists for JSW in addition to the evidence that of Whiteman's statement that implicates both Nucor and JSW. As far as the Sergevic email, it certainly meets the requirements of a joint plan and a conspiracy and there's allegations made that it didn't happen until after the conspiracy and that's not true. Exhibit 235 goes all the way to September 8. And as early as September 3, if you look at Exhibit 189, you'll see the plan by American Alloway or reference by American Alloway to helping Reliance. And that's squarely within the dates in Sergevic email. There's no objection to the Cooper testimony at the time. And as I said, as far as Jacobs, it's irrelevant whether it's a good policy or not. We didn't put on evidence about the wisdom of the policy. They objected to us putting on evidence about the wisdom of the policy. Mahoney didn't touch that. The question is whether they followed the policy, regardless of whether it was good policy, bad policy, or indifferent policy. And really what that was offered to show is that they must have done it because it was a good thing to do. As far as Ligon, if you want me to address Ligon, Ligon is not a group boycott case. It didn't overrule group boycott cases. Well, the last thing the Supreme Court said. Third Circuit has said it did. That's Toledo MAC? Toledo, yes. Again, I can define this group boycott in the narrowest sense, and it meets any requirements that you can have because of the nature of it. What Toledo MAC dealt with was the only horizontal agreement was the agreement by the distributors not to compete with one another. The real offending agreement was the restriction on the geographical location, and that's not a pure agreement between horizontal aligned people. So I don't know if that's required for a group boycott. There are vexing questions on what a group boycott is, but they're not vexing questions when you're talking about the very classic boycott we have here. Do you know of any Sherman Act case where a different rule of liability was attached to different participants in the conspiracy? No. No, as long as it is a source. So the fomentor or the orchestrator couldn't be held? I'm sorry, when you're a conspirator, you're in all the way, and you're liable for everything that happens in the conspiracy. There are situations where people do different things, you're an orchestrator or a joiner, but it doesn't make any difference as far as the liability as long as you're part of the conspiracy. But here is the most narrowly defined group boycott you can imagine with absolutely no pro-competitive effects in a commodity market where the only thing you can do is compete on price and service, and there's evidence that we had some of the best prices and the best service in the business, and so it is the classic boycott, and Toledo MAC is not, I can draw the line that satisfies Toledo MAC and still puts us in a group boycott that deserves, per se, liability. And all the cases can fit in that if you wanna draw it that narrowly. I'm not sure the line should be drawn that narrowly, but it certainly can be in this case. On damages. What about, I mean, when you enlist or approach a vertical supplier, and their behavior then facilitates the pre-existing horizontal cartel, you think the vertical supplier is still assessed at that point under per se rule by the- That's correct, and that's what the Supreme Court says at the very end of Ligon. We're not dealing with the situation where they're working with the horizontal agreement that starts, and that's what this court said on the final remand in Ligon, what this court said, even though the mandate rule applied and we're not gonna look at it, the court said, well, what we don't have here is a situation where we have a pre-existing horizontal agreement that a vertical actor is joining in, and that's why they have Tunica totally backwards. Now, what Tunica was looking at is this is an odd-looking conspiracy because it's purely horizontal. There's no vertical component, and none of the horizontal actors are competing with the plaintiff, so we've got to look under the hood a little bit and see if it runs like a per se liability case, but this is the classic case where you have, and group boycotts always have to involve a vertical arm in order to work unless you have the situation in Tunica, and there you have to have additional factors. If I could just mention a couple of things. When Ms. Blatt said we didn't contest damages, issues on damages are non-issues. First of all, Dr. McGee, who's MM's expert, never assumed initial inventory of $2.7 million. What he did was take the fact of initial capital and created an average inventory over the year, and you can see that in pages 14, 7, 10 through 13 of his testimony. Both experts agreed that Chapel Houston could be used as a yardstick, and you can look there at 19.373 through 19.374. You show that even Dr. Wiggins, the other side's expert, agreed that Chapel could be used as a yardstick. The question was whether to use the pre-boycott profit margin of Chapel Houston when Mike and Matt earned $73 million over 10 years or the post-boycott profit margin, and I can explain that. It takes a while to talk about that, but it doesn't matter because Dr. McGee used both margins. As he said on page 19, 581 in the rebuttal testimony, I ran the numbers using Dr. Wiggins' lower profit margin. It still comes within a range that the jury verdict comes within. And finally, there was plenty of evidence that market direction, which way the market was going with steel price demands going up, according to Mr. Fitch and the head of Reliance, Mr. Stratman, there was testimony that the non-compete lawsuit, which was settled after three weeks, was not a material problem for MM, so there was no downward pressure exerted on damages for those two things. So that's why Dr. McGee didn't take those into account as MM's expert, and the jury was entitled to believe both of those considerations in determining the damages in this case. So the damages issues are non-issues in this case, and there's been statements in the brief that Dr. McGee assumed an initial inventory of 2.7. He didn't. You look at page 29 of his report, page 22, 525 of the record, and you can see what he's doing, and he explains the difference between what he was doing and Dr. Wiggins was doing as well on rebuttal. So those are non-issues in the case, and we're certainly not saying that damages are any, that we have any weakness whatsoever in damages, because there was very careful and substantial evidence on why Chapel in Houston, at the time Mike and Matt ran it, is a perfect yardstick to use, and the best yardstick that Dr. McGee ever had. So I didn't want to not address damages in light of the comments made. Does the court have any other questions that it would like me to address? Thank you. Thank you. Mr. Johnson, you have a few minutes for rebuttal. Just one quick point on the Cooper statement he recanted. Later, it's in our brief. He couldn't remember if JSW was actually mentioned or not, and we've given you the sites in the brief. My final comment was simply, viasis, viasis, viasis. It says that the ultimatum is not enough. They have to also show that we acted inconsistently with our self-interest, and that deciding to pick more lucrative customers is in our self-interest. The plaintiff's burden, as set out in Monsanto and quoted in viasis, is not to just give an alternative reason, but to exclude the possibility of independent conduct. Not probability, possibility. And that's why I say the Supreme Court and this court have carved out certain areas where juries are just not allowed to go in order to give safety to legitimate conduct and not expose people to after the fact guessing by a jury on trouble damages. Thank you. Ms. Blatt. Thanks. I'm gonna go backwards from the brief. Damages, I mean, they didn't address it in the brief, so this is the first time I've heard a response was here at argument. And it's just made up. Their expert did start with a 2.7 in initial inventory, not capital. It was a $30 million pre-trebling error, which meant after trebling, $90 million. So when he says it's a non-issue, I respectfully disagree. But you can just, you'll look at it. On Jacobs, what he said was an absolute joke. The entire issue in this case is whether we had an independent economic justification. He cites one little statement from Jacobs missing the whole introduction that there was overwhelming economic justifications not to sell, that they had partnered, and then partnered with our competitor, that they were a two-bit startup operation that was new, that we're a Fortune 200 company that does business with established dealers. He was a never even challenged under Daubert, and he would have countered their expert. I mean, it is astonishing, unconscionable, inexplicable exclusion of expert. They don't have a single case anywhere in the United States where a expert was excluded in an antitrust case and a defendant was hit with a $160 million judgment, and because it was lack of relevance? Well, the incumbency policy did come in quite a bit. Sure. So what more would he have said? What more would he have said? They said, their expert said it was economically irrational. He told the jury it was unthinkable because you don't not return a phone call. You quote. Someone calls you up, you quote. And Jacobs says, no, why would you quote someone who identifies a pre-existing customer? That was economically irrational. Jacobs would have actually countered with their expert. You can just look at Mahoney. He keeps saying, the plaintiff's lawyer keeps saying, would you have any economic reason to not sell steel? No, sir, of course not. That would be unthinkable. And the expert would have said, no, no, there's actually lots of reasons when it's already a pre-existing customer, you don't need to quote. Chuck Jameges, I'm just gonna read you from Toledo Mac. What he said was incomprehensible, trying to distinguish it. But the court says, the rule of reason analysis applies even where the plaintiff alleges that the purpose, it's even worse, it's much worse in our case, of the vertical agreement between a manufacturer and dealer is to support the illegal horizontal agreement. So you're gonna have a circuit conflict. But on this, which is how you can avoid it, is he basically says the sole basis for the joinder of the horizontal is the Cooper testimony. You're gonna go read it again, and I know your clerks are too, and you're not gonna see anything other than American Alloy is mentioned in connection with everyone monitoring, but it's completely legal to monitor the business. But just that there was pressure from the biggest customers. And under your Matrix case, which is a shampoo salon case, and the Miles case from the Seventh Circuit of Tom manufacturer, evidence of dealer pressure, multiple dealer pressure from the manufacturer is not evidence that you knew about the two dealers themselves colluding. It's just not. There's two cases on point. Finally, on the Cooper, Rule 103B says we didn't have to object at trial. There was a massive motion objecting to Cooper. You didn't have to object, because you objected pre-trial. Uh-huh, and we objected on four things that are kind of indefensible. He never stepped up to it at the time. You have to adopt it at the time, saying it was fresh. You also can't render hearsay admissible by recording it. It was incomplete, and at trial, the lawyer got up and said, this is just gonna be a recorded recollection. We didn't have to renew it and say, by the way, are you still gonna overrule the objection we just made? It is laughable to say that the recording was not used. Again, you're gonna read the transcript where he says, Cooper started- Why don't you start saying it again? Time's up. Oh. You're waiving. Hi, sorry. All right, we have your arguments, and we'll be at recess until nine o'clock in the morning. Thank you very much.